UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-80872-CIV-COHN

NORREL SUTHERLAND and
NADINA SUTHERLAND,

            Plaintiffs,

vs.

RIC L. BRADSHAW, in his official capacity
as Sheriff of Palm Beach County,
BRIAN ALLISON, and DEPUTY PEREZ,

            Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AS TO ALL FEDERAL CLAIMS
and ORDER REMANDING STATE CLAIM**

**THIS CAUSE** came before the Court on Defendants' Joint Motion for Summary Judgment [DE 19/20], Plaintiffs' Response [DE 24], Defendants' Reply [DE 28], the parties' respective statements of uncontested facts [DE's 21 and 27] and the respective supporting materials [DE's 22 and 23], and is otherwise fully advised in the premises.

I.  BACKGROUND

Plaintiffs Norrel and Nadina Sutherland filed this action against Defendants Brian Allison, Deputy Perez, and the Palm Beach County Sheriff's Office ("PBSO") based on Mr. Sutherland's ("Plaintiff") treatment during his arrest.  The Amended Complaint brings claims pursuant to 42 U.S.C. § 1983 against the arresting officers, Defendants Allison and Perez ("Individual Defendants"), for excessive force and deliberate indifference to medical needs in violation of the Fourth Amendment.  Plaintiff

also brings claims against the PBSO for violations of the Americans with Disabilities Act ("ADA") by a public entity, 42 U.S.C. § 12131, and battery pursuant to Florida Statutes § 768.28.  In addition, Plaintiff's spouse asserts a claim for loss of consortium.

The claims arise from Plaintiff's arrest on February 17, 2008, for resisting arrest without violence following Plaintiff's complaints regarding a parking ticket issued to his van.[1]  The incident took place on a well-traveled road that bordered the Lake Worth Swap Shop.  Deputies Allison and Perez were dispatched to the location after a homeowner on the street, Susan Butler, complained about illegally parked vehicles.  Deposition of Brian Allison at p. 18-19 [DE 23-2] (hereinafter, "Allison Deposition").

After ticketing some vehicles, Deputy Allison saw from 50 yards away Plaintiff arguing with a tow truck driver.  Id. at 88-89.  After watching for a couple of seconds, Allison started to walk over because the argument was "heated."  Id. at 90.  Plaintiff was allegedly standing in the road, holding the parking ticket and yelling.  Id. at 91.  Allison decided to place Plaintiff under arrest because Plaintiff refused to come out of the roadway after Allison directed him to move.  Id. at 59.  Plaintiff was standing one or two feet in the roadway, according to Allison.  Id. at 85.

After parking on Davis Road and entering the Swap Shop, Plaintiff returned to his van to find a ticket.  It is undisputed that Plaintiff initiated the verbal confrontation with Officer Allison.  He testified in his deposition that when he questioned the officers about the parking ticket, he was standing in front of the van which was on the side of

---

[1] In reciting the facts, the Court resolves any disputed facts in favor of Plaintiff for purposes of the motion for summary judgment, though many of the disputed facts are not material to the ultimate legal conclusion.

the street, not standing in the street as suggested by the officers.  Deposition of Norrel Sutherland at p. 40 [DE 23-1] (hereinafter, "Plaintiff's Deposition").  Plaintiff asserted that Officer Allison was rude and used curse words from the inception of the incident.  Regardless of the relevance of Deputy Allison's language, Susan Butler, the homeowner who called police, testified that Plaintiff was not cooperating with police because they asked him to leave but he did not.  Deposition of Susan Butler at p. 29-30 [DE 21-2].[2]

On the material issue of excessive force, Plaintiff testified that Officer Allison first grabbed his left arm near the shoulder and pitched him forward as if to try and show Plaintiff the No Parking sign.  Plaintiff's Deposition at 41, 48.  Then, Deputy Allison came up to four inches from Plaintiff's face and called him a "f---ing moron."  Id.  Plaintiff asked if it was because he asked where the sign was that Defendant Allison called him a moron, but before he could finish the question, he "felt a chokehold from behind, and Officer Hollister then [grabbed] onto this arm, which is the right injured arm, and he started to . . . yank it, pull it, and Officer Allison held this arm, and then I started to plead, you know."  Id. at 42.  Plaintiff had a prior serious injury to his right arm that resulted in a deformity to the arm.  Plaintiff testified that after he voluntarily went to his knees upon request, the officers got him on the ground on his face, "and Officer Allison still [held] on to this arm.  This other officer, as if he try to dislocate this arm."  Id. at 43, 49.  The officers were attempting to handcuff Plaintiff at the time.

---

[2] The Court notes that Plaintiff was convicted of resisting arrest without violence and that there is no claim in this case for wrongful arrest, only for excessive force in the manner of the arrest.

Plaintiff testified that he was continuously pleading at this point that "this arm is sick" and that he could not put his right arm behind him as all three officers were instructing him to do so while cursing at him.  Id.  The eyewitness testified that she saw a "struggle" when the officers were handcuffing Plaintiff because Plaintiff was not cooperating.  Butler Deposition at 27-28.  Officer Robert Hite of the Palm Springs Police testified that he saw two officers attempting to handcuff a black male who was "struggling" with them by not placing his arms behind his back as instructed.  Deposition of Officer Robert Hite at p. 11-12 [DE 21-5].  Defendant Deputy Max Perez-Pizarro testified that Plaintiff "was pushing his arms away from Deputy Brian Allison's control" while on the ground.  Deposition of Max Perez-Pizarro at 22 [DE 21-4; 23-6].

Plaintiff testified that one officer (not Officer Allison) held him down with his knee in Plaintiff's back, while Officer Allison, despite Plaintiff's pleas, repositioned himself to get a better grip and then yanked Plaintiff's bad arm around causing excruciating pain.  Plaintiff's Deposition at 44.  Officer Allison got "extremely angry" and "literally yank, yank, yank until I felt a sharp shock."  Id. at 45.  Plaintiff did not know what happened but a few moments later he was standing in front of his truck with his hands in cuffs behind his back.  Id.  Plaintiff testified that he blacked out at some point from the pain in his arm, and that he was slammed into his truck.  Id. at 46.  He stated that the handcuffing took ten minutes.  Id. at 50.  Plaintiff was placed in a police car and eventually transported to the jail after his vehicle was searched.  Plaintiff was transported approximately 1 hour after the incident.  Deposition of Brian Allison at p. 17, 28 [DE 23-3].

Plaintiff testified that he did not request paramedic help, but did request "medical help" after sitting in the police car for ten minutes. Id. at 55-56, 59. Deputy Allison testified that Deputy Perez asked Plaintiff if he needed medical attention, but he said no. Allison Deposition at 69; Perez-Pizarro Deposition at 23. Plaintiff eventually saw a nurse at the jail before his release but he did not request medical attention because he was the next person to be processed out of the jail. Plaintiff's Deposition at 66. Plaintiff spent three hours at the jail. Id. at 68. Upon his release, his wife picked him up and they went straight to the hospital emergency room. Id. at 75. After being X-rayed, the doctor determined Plaintiff needed immediate surgery on his arm. Id. at 76. However, the surgery was performed early the next morning. Id. at 77. Plaintiff was hospitalized for a week. He continues to suffer some pain and reduction in movement.

Deputy Allison testified that while he and Plaintiff were standing up, and "he was resisting me for me to put him into handcuffs, I was yelling at him to get on the ground and he went to the ground." Allison Deposition at 49. Defendant Allison was pulling at him and holding Plaintiff's arm to get him out of the road, when Plaintiff went to the ground and went limp. Id. at 49-50. Before going limp, Allison had difficulty getting Plaintiff into handcuffs because he was "still kind of thrashing on the ground" and trying to bring his arms forward while Allison tried to bring Plaintiff's arms behind his back. Id. at 50-51. Allison recalls Deputy Perez assisted by kneeling down and holding Plaintiff's upper body down with both hands from Plaintiff's right side. Id. at 52-53. However, Deputy Perez does not remember placing his hands on Plaintiff during the handcuffing process. Deposition of Max Perez-Pizarro at 23.

Allison testified that while standard procedure is to handcuff a person with the arms behind them, there are exceptions for pregnant women and those with deformities. Allison Deposition at 60. In his five years, he has handcuffed suspects about fifteen times in front for these reasons. Id. at 61-62. After Plaintiff was placed in a seated position on the ground, he informed Deputy Allison that he had a "genetic deformity" in his right arm. Id. at 65; Deputy Perez-Pizarro deposition at 29. After confirming that Plaintiff's arm did not feel right, Allison reestablished the handcuffs in front of Plaintiff. Allison deposition at 65. Plaintiff was wearing a long-sleeve shirt that day.

Defendants moved for summary judgment as to all of Plaintiff's claims. Plaintiff opposes the motions.

## II. DISCUSSION

### A.  Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be

resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of Rule 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

### B.  Excessive Force

The Individual Defendants argue the undisputed facts demonstrate that they did not use excessive force on Plaintiff.  In response, Plaintiff argues that there are disputed issues of fact concerning the painful handcuffing processed used by the Individual Defendants, and that their actions clearly violate Plaintiff's constitutional rights.

Pursuant to 42 U.S.C. § 1983, a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  Plaintiff argues that the Individual Defendants violated his Fourth Amendment right to be free from excessive force and are therefore liable under § 1983.

"The Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force during a criminal apprehension." Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (citing Graham v. Connor, 490 U.S. 386, 394–95 (1989)).  "Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) (internal quotes omitted).  A court must use a balancing test involving several factors, "including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  Vinyard, 311 F.3d at 1347 (quoting Graham, 490 U.S. at 396).

### C.  Qualified Immunity

Even where a plaintiff demonstrates excessive force on the part of a law enforcement officer, the plaintiff also needs to demonstrate that the officer is not entitled to qualified immunity.  The doctrine of qualified immunity shields police officers

from lawsuits where the officers were acting within their discretionary authority, unless the officers both (1) violated a constitutional right and (2) the right was clearly established such that it was clear to a reasonable officer that the conduct in question was unlawful in the situation confronted by the officer. Saucier v. Katz, 533 U.S. 194, 201–02 (2001); Vinyard v. Wilson, 311 F.3d at 1346. Once officers prove that they acted within their discretionary duty, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Vinyard, 311 F.3d at 1346. In other words, the plaintiff must prove both that there was a violation of a constitutional right and that the right was clearly established.

When conducting a qualified immunity analysis at the summary judgment stage, a court "must take the facts in the light most favorable to the party asserting the injury." Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005) (citing Saucier, 533 U.S. at 201). The court thereby eliminates disputed issues of fact and takes the plaintiff's best case. Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006). The Supreme Court in Saucier emphasized that a court must address the elements of qualified immunity in the proper sequence. First, a court must determine whether officers violated a constitutional right. If they did not, then the court's inquiry ends and the officers are entitled to qualified immunity. See Saucier, 533 U.S. at 201.

If there was a violation of a constitutional right, then the court must determine if the right was clearly established. "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Court's

inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 201.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Id. at 205.

Accordingly, in order to determine whether officers violated clearly established rights, courts must determine "whether the state of the law . . . gave [the officers] fair warning that their alleged treatment . . . was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "The applicable law is clearly established if the preexisting law dictates, that is, truly compels, the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir. 2005) (alteration and internal quotes omitted). "It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004).

The Court of Appeals for the Eleventh Circuit has provided three general means by which a court can determine whether § 1983 defendants had "fair warning." First, courts can "look to see whether the federal statute or constitutional provision is so

clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law." Id. at 1250 n.6; see, e.g., Evans, 407 F.3d at 1283 (holding that "degrading and forceful manner of . . . strip search" could not have been considered reasonable under Fourth Amendment by any objectively reasonable police officer). In such circumstances, the constitutional or statutory violation must be so obvious that prior caselaw is unnecessary. See Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005).

"Second, if the conduct is not bad enough that it violates a constitutional provision on its face, [courts] look to case law that can be applied broadly to a number of factual situations." Kesinger, 381 F.3d at 1250 n.6. "[B]roader, clearly established principle[s]" may "control the novel facts" in a particular situation. See Mercado, 407 F.3d at 1159 (citing Hope, 536 U.S. at 741). "These principles may give notice to officers, provided that the decisions clearly apply to the situation at hand. The 'reasoning, though not the holding' of prior cases can also send 'the same message to reasonable officers' in novel factual situations." Id. (quoting Hope, 536 U.S. at 743).

"Third, and finally, if no broad case law is applicable, [courts] turn to case law precedent that is tied to the facts." Kesinger, 381 F.3d at 1250 n.6. "Any case law that is 'materially similar' to the facts in the case at hand must pre-date the officer's alleged improper conduct and 'truly compel the conclusion that the plaintiff had a right under federal law.'" Mercado, 407 F.3d at 1159 (quoting Ensley v. Soper, 142 F.3d 1402, 1406 (11th Cir. 1998)). In the Eleventh Circuit, courts must confine their case law search to cases from the Supreme Court of the United States, the U.S. Court of

Appeals for the Eleventh Circuit, and the relevant state supreme court.  Marsh v. Butler County, Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc).

The Supreme Court recently endorsed a two-step approach for determining whether a right was clearly established.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam).  The Court noted that there may be cases where violations are "obvious" under constitutional standards and the generalities of caselaw.  In such circumstances, specific caselaw is not required.  Id.  The Court suggested, though, that such cases are atypical, stating that the situation it was addressing—shooting a suspect while he was fleeing in a vehicle in a potentially dangerous manner—was "far from the obvious" case where excessive force standards govern.  Id.  Without an obvious fit, courts must focus on caselaw in a more "particularized" sense.  Id. (internal quotes omitted).  Although the Brosseau decision does not alter the Eleventh Circuit's three-step approach above, it suggests that the first two steps have a limited application.

### D.  Analysis of Excessive Force Claims

In the present case, it is clear that the Individual Defendants were acting under their discretionary authority as police officers.  Therefore, the Court turns to whether there was a constitutional violation and, if so, whether the violation involved clearly established constitutional law.

Plaintiff contends that the Individual Defendants violated Plaintiff's right to be free from excessive force during an arrest.  To determine this issue, the Court employs the factors set forth in Graham v. Connor, 490 U.S. 386, 396 (1989).  First, the Court

finds that the severity of the crime at issue is minor.  Second, the Court finds that suspect posed an immediate, albeit minor, threat to the safety of the officers or others.  Third, Plaintiff was actively resisting arrest, at least from the perspective of the officers and a civilian eyewitness.  Therefore, the Court concludes that a reasonable officer would have taken the same actions as the Individual Defendants.  Davis, 451 F.3d at 767.

Although Plaintiff argues that his deformity was open and obvious, the evidence does not support that claim, even in the light most favorable to Plaintiff.  Plaintiff wore a long-sleeve shirt so his arm was not visible.  He did not inform the officers of his deformity until during the handcuffing process, at which time Plaintiff yelled that his "arm was sick" and could not move behind him as instructed.

Plaintiff asks this Court to compare the Individual Defendants' conduct herein to that in Davis, wherein summary judgment was reversed on the excessive force claim.  In Davis, a homeowner came out to ask police why his street was closed off when he was arrested while walking away from officers and forcibly thrown into a dog cage in a canine unit.  451 F.3d at 767.  Unlike Plaintiff, Davis was subjected to "at least three incidents of [the officer] intentionally grabbing, pushing, or pulling on [Davis'] shoulder - - after he was handcuffed and after [Davis] informed [the officer] that he had a bad shoulder."  Davis, 451 F. 3d at 767-68.  In the case at bar, Plaintiff was approaching officers and questioning his own parking citation in or next to a public street, was resisting putting his arms behind his back, and was subject to a single action of forcible handcuffing.  Plaintiff yelled about his sick arm during handcuffing and seconds later

13

the injury to the arm occurred. The conduct in this case is distinguishable from that in Davis as to both severity and duration.

Plaintiff argues that the present case is distinguishable from Rodriguez v. Farrell, in which the Eleventh Circuit held that what "would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time." Rodriguez v. Farrell, 280 F.3d 1341, 1353. Standard behind the back handcuffing used on Rodriguez resulted in severe injuries to his arm due to recent elbow surgery. The Court rejects Plaintiff's argument that Rodriguez is distinguishable. Although Plaintiff's pre-existing condition was less hidden than Rodriguez's recent elbow surgery injury, Plaintiff has not met his burden that a reasonable officer in the Individual Defendants' position at the time of this incident would have acted differently in handcuffing Plaintiff.

Finally, Plaintiff also attempts to distinguish Secondo v. Campbell, 327 Fed. Appx. 126, 2009 WL 931686 (11th Cir. 2009). As in Rodriguez, Secondo had a pre-existing arm or shoulder injury that he specifically told the arresting officer about prior to his being handcuffed behind his back. As in Davis, Secondo was not resisting arrest. Despite the minor infraction for disorderly conduct, the fact that he was not resisting, and the fact that he specifically told the officer of his injury before handcuffing, the Eleventh Circuit affirmed summary judgment on the excessive force claim because the force used was objectively reasonable. Secondo, 327 Fed. Appx at

132-33.  In the present case, Plaintiff did not inform the officers of his injury prior to the commencement of handcuffing and was resisting arrest.

The Court finds that Plaintiff has not provided sufficient evidence to demonstrate that reasonable officers in the Individual Defendants' position at the time of this incident would have acted differently in handcuffing Plaintiff.  The Individual Defendants used a normal amount of force in handcuffing Plaintiff.  Not only was the force used against Plaintiff objectively reasonable, but that there was no clearly established right for police not to use  regular handcuffing procedures in the absence of clear circumstances that Plaintiff had an obvious prior injury that would be worsened by such procedures.  Although Plaintiff argues that his arm condition was obvious, the record does not support that contention, even taking the facts in the light most favorable to Plaintiff.  When the officers did feel Plaintiff's arm after the handcuffing process, they then recognized his deformity and adjusted his handcuffs to the front.  Again, while the Court does not seek to diminish the extent of Plaintiff's documented injury sustained during the handcuffing process, the amount of force used in this case was not constitutionally excessive.

### E.  Deliberate Indifference Claim

Plaintiff alleges that Defendants Allison and Perez were deliberately indifferent to Plaintiff's serious medical needs regarding his fractured arm while he was handcuffed for an hour in the police car.  In Plaintiff's deposition, he testified that while he declined needing paramedics to come to the scene, he did request medical help.

Defendants testified that they offered him medical help, but he refused.  The Court views the disputed facts in the light most favorable to Plaintiff.

As a pre-trial detainee, Plaintiff's claims are brought pursuant to the Fourteenth Amendment and § 1983.  Harper v. Lawrence County, Ala., 592 F.3d 1227, 1230 n. 3 (11th Cir. 2010).  A plaintiff must allege facts that, if true, allege an objectively serious medical need and that a defendant acted with deliberate indifference to that need. Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008).  To establish "deliberate indifference," Plaintiff must show that Defendants "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence."  Id.  Plaintiff has not met that burden in this case.

The Court can assume from the Plaintiff's affidavit submitted in opposition to Defendant's Motion for Summary Judgment that the extent of his injury constitutes an objectively serious medical need [DE 27-1].  However, Plaintiff has failed to meet his burden to show that Defendants Allison or Perez had subjective knowledge of his injury or disregarded such a risk given that there is no dispute that they offered him paramedic help and he refused.  Even taking as true the Plaintiff's testimony that they shortly thereafter refused him medical attention, the officers' actions in this case did not rise beyond gross negligence, as despite a delay of an hour, they in fact moved his handcuffs to the front before transporting him from the scene to the police station.

## F.  ADA Claim against PBSO

Plaintiff asserts a claim against the PBSO for denying him a benefit and/or discriminating against him under the ADA "when he was not handled and transported to jail in a safe and appropriate manner consistent with his disability," with regard to his being left handcuffed behind his back in a police car for an extended period of time. Amended Complaint, ¶ 40 [DE 14].  In order to state a claim under the Title II of the ADA, Plaintiff must prove (1) he is a qualified individual with a disability; (2) he was denied the benefits of public entity's services or otherwise discriminated against by the public entity; and (3) that the denial of benefit or discrimination was by reason of the plaintiff's disability.  Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007).  In Bircoll, the Eleventh Circuit affirmed the grant of summary judgment to defendants because a deaf motorist arrested for driving while intoxicated failed to show discrimination in the police failing to reasonably accommodate the plaintiff.  The Court emphasized that the reasonableness of modifications must be viewed relative to the particular circumstances of being police officers out in the field, where police must physically arrest suspects, secure the scene, and ensure no threat to anyone's safety, as compared with the less exigent circumstances at a police station.  Id. at 1085-86.

In a more recent unpublished decision involving a deaf arrestee, the Eleventh Circuit noted that a plaintiff can proceed under the ADA on theories of intentional discrimination, disparate treatment or failure to make reasonable accommodations. Rylee v. Chapman, 316 Fed. Appx. 901, 906, 2009 WL 485742 (11th Cir. 2009).  Under

a failure to make reasonable accommodations theory, the defendant's duty is not triggered until the plaintiff makes a specific demand for an accommodation.  Id.

The claim in this case relates to the alleged lack of accommodation in handcuffing Plaintiff behind his back despite his deformed arm.  Defendants assert that Plaintiff is not a qualified individual with a disability because the officers had no way of knowing of his disability until he told them -- at which point they shifted his handcuffs to the front.  Plaintiff argues that Defendants were informed of his disabled arm at the initial handcuffing stage and the hour he was made to sit in the police car constituted disability discrimination.

Even if the Court accepts Plaintiff's testimony that Defendants were aware of his disability after the initial handcuffing, there is no evidence that Defendants failed to accommodate any request.  When Plaintiff did complain, Defendants in fact moved his handcuffs to the front.  Plaintiff was not entitled to any other modification of police field procedures under the ADA.  The Court therefore concludes that Defendant PBSO is entitled to summary judgment as Plaintiff as failed to assert a genuine issue of material fact on his ADA claim.

### G.   Battery Claim against PBSO

Defendant PBSO argues that Florida Statutes Section 768.28(9) provides immunity from intentional torts committed by the Defendant deputies, including the battery claim in Count IV of the Amended Complaint.  However, the claim in Count IV does not allege bad faith or malicious purpose, but rather alleges an intentional tort.

Defendants rely upon Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla. 1985), a case concerning a government entity's liability for negligence regarding discretionary actions with regard to property inspections.

Plaintiff, however, relies upon a case directly on point, Richardson v. City of Pompano Beach, 511 So.2d 1121, 1123 (4th DCA 1987), *rev. den*., 519 So.2d 986 (Fla. 1988). This decision held that not all intentional torts are done with "wanton and willful disregard." Thus, under Florida Statutes Section 768.28(9), a plaintiff can allege an intentional tort without alleging bad faith or malicious purpose, and not have the defendant government entity be immune from such a suit. Plaintiff in this case is not seeking punitive damages for this claim, and therefore has not alleged conduct that would make the PBSO immune.

The Court therefore denies the motion for summary judgment on the battery claim on grounds of statutory immunity.

### III. CONCLUSION

The Court will grant summary judgment to Defendants on Counts I, II and III of the Amended Complaint. The Court is left with only a state law claim for battery against the PBSO and a loss of consortium claim. With the dismissal of all the federal claims, this Court declines to exercise supplement jurisdiction over the remaining state law claim under 28 U.S.C. § 1367. Rather, § 1367(c)(3) allows a district court to decline to exercise supplemental jurisdiction when all claims over which it has original jurisdiction have been dismissed, as is now the case herein. If all federal claims are eliminated before trial, the pendent state claims should be dismissed. United Mine Workers v.

Gibbs, 383 U.S. 715, 726 (1966).  The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."  Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004).

        Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Joint Motion for Summary Judgment [DE 19/20] is hereby **GRANTED in part** as to Counts I, II and III, and **DENIED in part** as to Count IV;

2. The Court shall separately enter a final summary judgment in favor of Defendants as to Counts I, II, and III;

3. The Court will remand by separate order the remaining claims back to the Circuit Court in and For Palm Beach County, where this case was initiated.

        **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 16th day of March, 2010.

*[Signature]*
JAMES I. COHN
United States District Judge

Copies provided to:
counsel of record on CM/ECF